lml

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **GOVERNOR OF THE STATE** | ) | |
| **OF KANSAS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 03-4140-JAR** |
| | ) | |
| **GALE NORTON, SECRETARY OF** | ) | |
| **THE INTERIOR, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>MEMORANDUM ORDER AND OPINION</u>

This case concerns the decision of the Secretary of the Interior ("the Secretary") to take

.52 acres of land known as "the Shriner Tract" into trust on behalf of the Wyandotte Indian Tribe

of Oklahoma ("the Tribe") under the mandate of Pub. L. 98-602.  Plaintiffs Kathleen Sebelius,

the Governor of the State of Kansas, Iowa Tribe of Kansas and Nebraska, Kickapoo Tribe of

Indians, Prairie Band of Potawatomi Nation and Sac and Fox Nation of Missouri in Kansas ask

this Court to reverse the Secretary's decision to take the Shriner Tract into trust for the Tribe,

arguing that defendant acted in an arbitrary and capricious fashion by failing to scrutinize

whether only Pub. L. 98-602 funds were used to purchase the Shriner Tract.  For the reasons

explained in detail below, the Court determines that the Secretary's decision should be affirmed

and that plaintiffs' remaining claims for relief should be denied.

## I.        Procedural Background

This long-pending litigation arises from the Tribe's efforts to take a tract of land in

Kansas City, Wyandotte County, Kansas ("the Shriner Tract") into trust on behalf of the Tribe,

purportedly under the mandate of Pub. L. 98-602, as part of its plan to conduct gaming in Kansas City, Kansas.  In 1984, Congress enacted legislation providing for the appropriation and distribution of money in satisfaction of judgments awarded to the Tribe by the Indian Claims Commission ("ICC") and the Court of Claims.[1]  Key to this case was the directive that "[a] sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of such Tribe."[2]

The National Indian Gaming Commission ("NIGC") Chairman approved the Tribe's gaming ordinance in June 1994.  The approved ordinance is not site specific.  In 1996, the Tribe requested that the Secretary take the Shriner Tract into trust on its behalf.  The Tribe intended to purchase the Shriner Tract with the ICC funds and contended that the statute mandated that property purchased with such funds be taken into trust by the Secretary.[3]

On July 12, 1996, the last day of the comment period,[4] then-Governor Bill Graves, the Sac and Fox Nation of Missouri, Iowa Tribe of Kansas and Nebraska, and Prairie Band of Potawatomi Indians ("plaintiffs"), filed an action challenging the Secretary's decision to accept the Shriner Tract into trust, and that same day, obtained a temporary injunction preventing the trust acquisition.[5]  Plaintiffs argued that the Secretary's decision to accept the Shriner Tract into trust was in error because: (1) the Secretary was not mandated under Pub. L. 98-602 to accept the Shriner Tract; (2) the Secretary failed to comply with the National Environmental Policy Act

---

[1]*See* Pub. L. 98-602, 98 Stat. 3149 (1984).

[2]98 Stat. 3151 (1984).

[3]*See* 98 Stat. 3149, 3151 (1984).

[4]25 C.F.R. § 151.12(b).

[5]*Sac & Fox Nation of Missouri v. Babbitt,* 92 F. Supp. 2d 1124, 1125 (D. Kan. 2000).

2

of 1969 ("NEPA"),[6] and the National Historic Preservation Act ("NHPA")[7] when accepting the Shriner Tract into trust;[8] and (3) the Secretary acted in an arbitrary and capricious manner when analyzing whether Pub. L. 98-602 funds were used to purchase the Shriner Tract.

The Tribe moved to intervene and took an emergency appeal to the Tenth Circuit Court of Appeals.  The Tribe asserted that if it was not able to close the land purchase immediately, it would lose the opportunity to purchase the land.[9]  The Tenth Circuit vacated the injunction and the same day, the Secretary accepted the Shriner Tract into trust for the benefit of the Tribe.[10]  In so ruling, the court specifically held that the respective rights of the parties to obtain judicial review of all issues raised shall be preserved.[11]

The matter was remanded to the district court, which dismissed the Complaint for failure to join an indispensable party, the Tribe.[12]  While the district court did not rule on the merits of the case, it did note that had it been required to address the merits, the court would have ruled that Pub. L. 98-602 was a mandatory trust acquisition statute, and that the non-discretionary nature of the decision exempted it from the application of both NEPA and NHPA.[13]

Plaintiffs appealed the district court's dismissal to the Tenth Circuit.  On appeal, the

---

[6]42 U.S.C. § 4321.

[7]16 U.S.C. § 470.

[8]*Sac & Fox v. Babbitt,* 92 F. Supp. 2d at 1128-29.

[9]*See Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1257 (10th Cir. 2001).

[10]*Id.*

[11]*Id.*

[12]*Sac & Fox v. Babbitt,* 92 F. Supp. 2d at 1124.

[13]*Id.* at 1128.

3

Circuit rejected the district court's analysis under Fed. R. Civ. P. 19, finding that the United States was able to adequately represent the Tribe's interests in the case.[14]  The court affirmed the district court's conclusion that Pub. L. 98-602 is a mandatory trust acquisition statute, that the Secretary had no discretion in accepting title to the Shriner Tract in trust for the Tribe, and that neither NEPA nor NHPA analysis was required for the non-discretionary decision to take the property into trust.[15]

The Circuit went on to conclude, however, that the Secretary's determination that only Pub. L. 98-602 funds were used to purchase the Shriner Tract was not supported by substantial evidence in the record.[16]  Accordingly, the Circuit remanded the case to the district court with instructions for the court to order the Secretary to consider further the question of whether *only* Pub. L. 98-602 funds were used for the acquisition.[17]  On remand, the district court remanded the case to the Secretary "to reconsider whether Pub. L. 98-602 funds *alone* were used to purchase the Shriner Tract in connection with the decision to approve taking the Shriner Tract into trust for [the Tribe]."[18]

On March 11, 2002, the Secretary issued her decision following remand, and published in the *Federal Register* the determination that "funds used to purchase the Shriner property in

---

[14]*Sac & Fox v. Norton,* 240 F.3d at 1262 (noting that the documents in the record suggested that nearly half of the funds used to acquire the Shriner Tract were non-Pub. L. 98-602 funds, specifically the April 12, 1995 resolution of the Tribe, an April 19, 1996 letter from the Tribe to the Bureau of Indian Affairs ("BIA") outlining its plan for purchasing the Shriner Tract, and an email message from one BIA employee to another suggesting that some agency employees were aware that the Pub. L. 98-602 funds remaining and available would not cover the entire purchase price).

[15]*Id.* at 1261-63.

[16]*Id.* at 1263-64.

[17]*Id.* at 1264 (emphasis added).

[18]*Sac & Fox Nation v. Norton,* No. 96-CV-4129 (D. Kan. Aug. 22, 2001) (emphasis added).

Kansas City, Kansas were from the Section 602 settlement on specific land claims," then "affirmed the trust status of the subject lands."[19]  Plaintiffs sought and were granted a reconsideration of the determination.  The parties were permitted to brief the issues, although plaintiffs' request for discovery was denied.[20]  The Secretary issued an Opinion on Reconsideration on June 12, 2002, affirming that the Shriner Tract was purchased with Pub. L. 98-602 funds and that it was validly taken into trust by the Secretary.[21]

On July 11, 2003, plaintiffs[22] filed their Complaint for Declaratory and Injunctive Relief, Mandamus and Review of Final Agency Action, challenging as arbitrary and capricious the Secretary's determination to accept the Shriner Tract into trust for the benefit of the Tribe. Plaintiffs seek to have the taking of the Shriner Tract into trust declared as void *ab initio*, an order in mandamus directing the defendants to revoke the non-discretionary trust status of the Shriner Tract and rescind all other trust actions and applications and determinations concerning status.  Plaintiffs also seek an order directing defendants to engage fully in the discretionary review of the Tribe's trust application regarding the Shriner Tract and complete the required regulatory reviews under the NEPA and NHPA.  Alternatively, plaintiffs seek an order remanding this matter to defendants for further consideration and evidentiary development of the record.

On July 27, 2005, this Court remanded this matter to defendants to permit plaintiffs to

---

[19](AR1 0004.)

[20](AR2 0116.)

[21](AR2 0320-0326.)

[22]The plaintiffs in the instant case are the same as in the *Sac & Fox Nation* cases with the exception that the present governor is Kathleen Sebelius.

supplement the administrative record (Doc. 56).[23]  The scope of remand was limited to additional investigation or explanation of the supplemental evidence set forth in plaintiffs' Exhibit B, a copy of a letter dated October 12, 1995, addressed to Guarantee Title Company and a copy of a $5,000 check purportedly drawn on the account of North American Sports Management ("NORAM") as the initial escrow deposit required in the real estate contract for the purchase of the Shriner Tract.

On December 16, 2005, defendants filed their Opinion on Remand and Record (Doc. 65). After considering materials submitted by plaintiffs and the Tribe concerning Exhibit B, defendants concluded that the documents contained in Exhibit B do not alter the June 12, 2003 conclusion of the Secretary that the Tribe used settlement funds to purchase the Shriner Tract pursuant to the authority granted in Pub. L.  98-602.  Defendants concluded that there is no compelling evidence presented by the parties in the second remand that the Tribe improperly used funds other than those identified by Congress in Pub. L. 98-602 to purchase the Shriner Tract, specifically rejecting plaintiffs' contention that the Tribe applied the $5000.00 to the purchase price of the land and finding no reason to discount the Tribe's claim that it was "meticulous" in applying only Pub. L. 98-602 funds to the $180,000.00 purchase price, the $5000.00 (and other sums) being used for closing costs and other costs over and above the purchase price.  The Court subsequently directed the parties to submit additional briefing on this limited issue, and both parties have complied.

## II.     Standard of Review

---

[23]The fact that the Court remanded this matter to the administrative agency for the taking of limited additional evidence did not vitiate the agency's original decision, but instead permitted the agency to consider new evidence and to modify its decision as necessary.

6

Under the Administrative Procedure Act ("APA"), "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[24]  The "ultimate standard of review is a narrow one."[25]

The APA authorizes the reviewing court to "compel agency action unlawfully withheld" and to "hold unlawful and set aside agency actions, findings, and conclusions" that the court finds to be, as plaintiffs allege here, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[26]  The Tenth Circuit has identified the "essential function" of agency review as an analysis of the following: "(1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion."[27]

"'The duty of a court reviewing agency action under the "arbitrary or capricious" standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made.'"[28]  The reviewing court must decide "'whether the agency considered all relevant factors and whether there has been a clear error of judgment.'"[29]  "Because the arbitrary and capricious standard focuses on the rationality of an

---

[24]5 U.S.C. § 702.

[25]*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

[26]5 U.S.C. §§ 706(1), 706(2)(A); *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1573-75 (10th Cir. 1994).

[27]*Olenhouse*, 42 F.3d at 1574 (citations omitted).

[28]*Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002) (quoting *Olenhouse*, 42 F.3d at 1574 (footnote omitted)).

[29]*Id.* (quoting *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir. 2000)) (further quotation omitted).

agency's decisionmaking process rather than on the rationality of the actual decision, '[i]t is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"[30]  "Thus, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record."[31]  "The agency must make plain its course of inquiry, its analysis and its reasoning."[32]  "After-the-fact rationalization by counsel in briefs or argument will not cure noncompliance by the agency with these principles."[33]

"In addition to requiring a reasoned basis for agency action, the 'arbitrary or capricious' standard requires an agency's action to be supported by the facts in the record."[34]  Thus, agency action will be set aside as arbitrary unless it is supported by "substantial evidence" in the administrative record.[35]  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[36]  "This is something more than a mere scintilla but something less than the weight of the evidence."[37]  "Evidence is generally substantial under the APA if it is enough to justify, if the trial were to a jury, refusal to direct a

---

[30]*Olenhouse*, 42 F.3d at 1575 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 50 (1983)).

[31]*Colorado Wild, Heartwood v. United States Forest Service*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Olenhouse*, 42 F.3d at 1575).

[32]*Id.*

[33]*Id.*

[34]*Olenhouse*, 42 F.3d at 1575.

[35]*Pennaco Energy, Inc. v. United States Dep't of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (citing *Olenhouse*, 43 F.3d at 1575).

[36]*Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003) (internal quotation omitted).

[37]*Foust v. Lujan*, 942 F.2d 712, 714 (10th Cir. 1991) (discussing "substantial evidence" standard).

verdict on a factual conclusion."[38]  It is not the court's duty, however, to substitute its judgment

for that of the agency's on matters within its expertise.[39]  Moreover, the court "typically defer[s]

to the 'reasonable opinions' of agency experts in matters implicating conflicting expert

opinions."[40]

## III.    Facts

### *Pub. L. 98-602 Funds*

In May 1986, $100,000.00 of the Pub. L. 98-602 funds were deposited into A.G. Edwards

Account No. 232 02-393 00.  In June of that year, $95,000.00 of the $100,000.00 was used to

purchase Ryan Mortgage Acceptance Corporation III 8.375% Series 23 bonds.

In 1989, the bonds purchased with Pub. L. 98-602 funds were transferred from the A.G.

Edwards account to Mercantile Investment Account No. 240 677 69.  In November 1991,

$25,199.67 was withdrawn from the Mercantile Investment account by the Tribe for purchase of

property in Park City, Kansas.  The November 1991 Mercantile Investment account statement

documents the market value of the bonds at approximately $79,000.00 and the cash funds at

$629.91.  In November 1991, $79,000.00 in market value attributed to the Pub. L. 602 funds was

transferred from the Mercantile Account No. 240 677 69 to the Tribe's Investment Account with

Mercantile and commingled with other assets, as confirmed by KPMG in its activity report for

1991 and the December 1991 statement.  In its report to the Tribe, however, KPMG theorized

that the value of the Pub. L. 98-602 funds as of December 1991 was $131,707.14, due to its

---

[38]*Hoyl v. Babbitt*, 129 F.3d 1377, 1383 (10th Cir. 1997).

[39]*Colorado, Wild Heartwood*, 435 F.3d at 1213-14 (citing *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989)).

[40]*Id.*

valuation analysis based upon face value of the bonds (the amount of principal payable on the bonds at maturity), plus imputed interest and dividend earnings to that date.

In July 1996, $180,000 was drawn from the Mercantile Investment Account in issue. These funds came from a margin account loan against an account in which the Pub. L. 98-602 funds were held as investments, and not the liquidation of any corporate bonds purchased with Pub. L. 98-602 funds. The margin account loan was made against the market value of the holdings in the account, the value of which the parties dispute. Plaintiffs contend that as of July 1996, the market value of the Pub. L. 98-602 funds plus accumulated interest was $112,595.00; defendants contend that as of that date, KPMG placed the market value of the original $100,000.00 Pub. L. 98-602 fund investment at $212,170.00.

### Purchase of the Shriner Tract

The Tribe's January 1996 Fee to Trust Land Acquisition Application reflects an agreement on behalf of Nations Realty Corporation, Inc. ("Nations Realty") to purchase the Shriner Tract for $325,000.00.[41] Nations Realty is a subsidiary of North American Sports Management, Inc. ("NORAM"), and was an entity with whom the Tribe had contracted for financing and development of gaming facilities on the Shriner Tract. The application included an amended Chicago Title Insurance Company commitment for title insurance dated January 24, 1996 in the amount of $325,000.00 as well as a July 1995 Commercial and Industrial Real Estate contract between McCurry Enterprises, Inc. ("McCurry Enterprises") and Nations Realty in the

---

[41](AR3 0100.) The application indicates the Tribe intended to purchase four tracts of land in downtown Kansas City, Kansas, which included the .52 acre tract know as the "Shriner Tract." The application indicated that the Tribe planned "to develop and operate a 50,000 square foot Class II and Class III gaming facility" on the land as well as an Indian Cultural Center and Museum. (AR3 0096.) In mid-April 1996, the Tribe narrowed the scope of their acquisition request from the four tracts to the Shriner Tract, apparently because that was where it hoped to locate its gaming facility and it appeared the Shriner Tract could be placed in trust more quickly. (AR3 0268.)

amount of $325,000.00.[42]  The contract between Nations Realty and McCurry Enterprises

obligated Nations Realty to pay a sales commission of 6% of the purchase price to B.A. Karbank

& Co., the identified real estate broker, which amounted to $19,500.00.

The July 1995 contract obligated Nations Realty to provide a $5000.00 earnest money

deposit at the signing of the contract that was to be deposited in the escrow account at Guaranty

Title as part of the consideration for the sale with the balance to be paid as set forth therein.  The

balance of the purchase price was defined in the contract as $205,000 to be paid "in guaranteed

funds or cashier's check at closing (as defined in this Contract), adjusted at closing for pro

rations, closing costs and other agreed expenses," with the remainder of the purchase price,

$115,000.00, paid in the form of an assignment and assumption of a Contract for Deed.

An agreement was entered into on October 12, 1995, between McCurry Enterprises

(seller) and Nations Realty (buyer).  This agreement established the effective date of the real

estate contract for the purchase of the Shriner Tract as October 12, 1995, and referenced the fact

that Nations Realty had forwarded the $5000.00 earnest money to B.A. Karbank & Co. to be

deposited at Guaranty Title.

On October 12, 1995, B.A. Karbank & Co. sent a letter to Donna Bardwell of Guaranty

Title Company regarding the Shriner Tract transaction.  This letter referenced an enclosure of a

check in the amount of $5000.00 "from the Buyer as earnest money on the referenced property

between McCurry Enterprises, Inc. (Seller) and Nations Realty Corporation, Inc. (Buyer)."  The

check was drawn on NORAM in the amount of $5000.00 and deposited by Guaranty Title

Company pursuant to the deposit ticket that reflected the receipt and deposit of the funds for

---

[42](AR3 0123-0126, 0134-0138.)

purchase of the Shriner Tract transaction.  The check contained a specific reference that it was for the "Shriner Building."

On February 27, 1996, an appraisal done for the Department of Interior reflected a value of $182,000 for the Shriner Tract.[43]  On February 29, 1996, the Muskogee Area Office requested Sharon Blackwell, the Tulsa Field Solicitor, to begin the title examination process, which reflected the January 1996 title commitment in the amount of $325,000 for the Shriner Tract.[44] On March 25, 1996, Blackwell issued a preliminary title opinion for the Shriner Tract in the amount of $180,000.[45]

On March 26, 1996, B.A. Karbank & Co. sent a letter to Steve Osborn at Guaranty Title enclosing a statement for real estate commission in accordance with paragraph 11 of the July 1995 contract.  This statement specifically noted that the sale price for the Shriner Tract was $325,000.00 with a commission payable at the rate of 6%, resulting in a commission due at closing of $19,500.00.

On or about June 17, 1996, a second Commercial/Industrial Real Estate Sale Contract was entered into between Nations Realty and McCurry, which reflected a purchase price of $180,000.00 for the Shriner Tract.[46]  This contract provided the following hand-written amendments regarding the $5000.00 earnest money and the total purchase price for the Shriner Tract:

---

[43](AR3 0154.)

[44](AR3 0206.)

[45](AR3 0235.)

[46](AR2 0275.)

IV.   PURCHASE PRICE: The purchase price is One Hundred Eighty Thousand and no/100 DOLLARS ($180,000.00) which Buyer agrees to pay as follows: Five Thousand and no/100 DOLLARS ($5000.00) Earnest Money deposited in the insured trust or escrow account of Guarantee Title Co. ("Escrow Agent") as part of the consideration of the sale; the balance to be paid in the following manner: approximately One Hundred Seventy-Five Thousand and no/100 DOLLARS ($175,000.00) in guaranteed funds or cashier's check and Closing (as defined in this Contract), adjusted at Closing for prorations, closing costs and other agreed expenses.

The contract included a real estate commission to B.A. Karbank & Co., which continued to be the representative of the buyer, exclusively.[47]  The contract also included an addendum providing that because of several extensions to the closing date, caused by the litigation initiated by plaintiffs in 1996, Nations Realty agreed to pay an additional $15,000 at closing that would not apply to the purchase price and that was consideration for McCurry's agreement to grant the extensions.[48]  On June 21, 1996, Nations Realty assigned its interest in the June 1996 contract to purchase the Shriner Tract to the Tribe.[49]

On or about June 19, 1996, Nations Realty and McCurry also entered into a noncompetition and nondisclosure agreement whereby Nations Realty agreed to pay the sum of $152,250 in exchange for McCurry, a non-Indian entity, agreeing not to engage in a competitive gambling or other entertainment facility within a one-mile radius of the Shriner Tract and not to disclose information regarding the terms of the real estate purchase agreement and Nations Realty's plans for rehabilitation and use of the property.[50]  There is no evidence in the

---

[47](AR2 0279.)

[48](AR2 0278.)

[49](AR3 0348.)

[50](AR2 0280-0284.)

administrative record that the noncompete agreement was assigned to the Tribe.

The July 16, 1996 closing statement for the purchase of the Shriner Tract sets out the various debits and credits anticipated for the closing on the real estate.[51]  The debits include the contract sale price, closing fees, judgment search, recording fees, real estate commission of $19,500 and copying/delivery fees, all of which totaled $199,823.50.  The credits include prorated real estate taxes of $4878.96 and the $5000.00 earnest money deposit, all of which totaled $9,878.96.  Based on the closing sheet, there was a $189,944.54 balance due at closing from the purchaser, the Tribe.

The July 16, 1996 disbursement statement reflects that the Tribe presented $180,000.00 for the purchase price and $19,823.50 for the real estate commission and other expenses at closing.[52]  The sum of those amounts is $199,823.50, which is the amount on the closing sheet for the entire costs of the transaction, without any credits, including the $5000.00 earnest money deposit.  The disbursement statement further reflects that there was an overpayment of $9668.90 at closing, which was refunded to the Tribe.  A check from Nations Realty to McCurry in the amount of $15,646.98 was also issued on this date, per the addendum.

The parties dispute whether the $5000.00 earnest money was applied to the purchase price or closing costs.  Plaintiffs claim the former, arguing that the $5000.00 had been deposited and applied to reduce the purchase price months before the closing, and that NORAM never received a refund of the $5000.00 it provided.  Defendants counter the latter, arguing that the Tribe came to closing without any apparent intent to be given credit for the earnest deposit, and

---

[51](Plaintiffs' Ex. G.)

[52](Plaintiffs' Ex. H.)

that the $9668.90 overpayment was more than enough to repay the $5000.00 earnest deposit. Moreover, on July 12, 1996, $180,000.00 was disbursed from the Mercantile Account held for the Tribe, providing further verification that the purchase price was paid by the Tribe.

### *Agency Determination on Reconsideration*

### 1. Purchase of the Shriner Tract

In the course of the reconsideration process, on September 9, 2002, John Jasper, attorney/advisor for the Department of Interior, wrote a memo to George Skibine, Director, and Thomas Hartman, financial analyst, specifically asking them to focus on and respond to the factual allegations made by the plaintiffs herein that the purchase price of the Shriner Tract was $325,000.00, not $180,000.00.  Hartman responded to Jasper in his memo of February 5, 2003 that "Exhibit 47 in the Administrative Record states that First Nations Realty had the contract to purchase Shriner's land and building for $180,000.00 ($100,000.00 for the land and $80,000.00 for the building)."  Exhibit 47 in the Administrative Record is an April 1996 letter of Chief Bearskin, which states that the

> Wyandotte will purchase the Shriner's land for $100,000.00 and the Shriner's building for $80,000.00.  The funds required for closing on the Shriner's land will be wired from the trust account maintained by the Mercantile Bank of Joplin, Missouri to an account identified by the seller prior to closing.  The funds required for closing on the Shriner's building will be wired from another Tribal account to an account identified by the seller prior to closing.[53]

In its Order of Reconsideration, defendants found that the Administrative Record showed that the Shriner Tract was purchased for $180,000.00.  This record included the following documents in support of this finding: (1) the $325,000.00 figure was part of a 1995 contract to

---

[53](AR3 0268-0269.)

purchase the real estate and, in June 1996, a new real estate contract was entered into for

$180,000.00, with a new title commitment in the same amount;[54] (2) the February 1996

independent appraisal of the Shriner Tract for $182,000.00;[55] (3) the Commitment No. T-169736

for a policy of title insurance in the amount of $180,000.00 that was reviewed by the Field

Solicitor prior to her March 25, 1996 preliminary title opinion;[56] (4) the Tribe's resolution that

the tract of land that they chose in Kansas City would be purchased at a "price less than the

appraised fair market value;"[57] and (5) the Tribe's representation that the Shriner Tract was being

purchased for $180,000.00.[58]

### 2. Actual Sources of Funds Used to Purchase Shriner Tract

Upon remand from the Tenth Circuit, the Tribe retained KPMG Peat Marwick

("KPMG"), an independent accounting firm, to analyze the Tribe's accounting of the Pub. L. 98-

602 funds.  After reviewing financial records supplied by the Tribe, KPMG concluded that the

Tribe's "computations were appropriate and that the ending value that resulted from the initial

$100,000 investment was $212,170 at the time of the land purchase."[59]  KPMG found that on

July 12, 1996, the Tribe withdrew $180,000 of Pub. L. 98-602 funds from an investment account

for the purchase of the Shriner Tract.[60]  Plaintiffs retained their own certified accountants,

---

[54](AR2 0275, AR3 0235.)

[55](AR3 0193-0194.)

[56](AR3 0235.)

[57](AR3 0082.)

[58](AR3 0269, 0338.)

[59](AR1 0008, 0012.)

[60](AR1 0266.)

16

Purinton, Chance and Mills, who concluded that the Shriner Tract was purchased with a Margin Account Loan.[61]

The Department of Interior had its own Financial Analyst for the Indian Gaming Management Staff, Thomas Hartman, review the analysis of the Tribe's use of Pub. L. 98-602 funds. Hartman concluded that KPMG's methodology was appropriate and the calculations were correct. He also concluded that the $180,000.00 used to purchase the Shriner Tract came entirely from Pub. L. 98-602 funds and their earnings.

Hartman reviewed plaintiffs' arguments and theories that Pub. L. 98-602 funds were not used to purchase the Shriner Tract, as well as the report from plaintiffs' accountants. Hartman was specifically requested by legal counsel to the agency to review the arguments raised by plaintiffs, including the "10 reasons" why the KPMG report is seriously flawed and unreliable, as listed in plaintiffs' brief before the agency. Hartman concluded that the Pub. L. 98-602 money was invested in bonds and commingled with other investments, the Pub. L. 98-602 investments did not lose money, and there was adequate money to purchase the Shriner Tract for $180,000.00. He also noted that there was no evidence in the record to suggest that the bonds would be redeemed prematurely or that any loan against the Pub. L. 98-602 funds would not be repaid at full face value. With respect to plaintiffs' reason number 10, that the $180,000 came from a loan on a margin account, Hartman stated,

> [i]n a commingled account, using the cash portion would be quite reasonable, particularly if the bonds had a higher yield than the cash. The proportionate share of Pub. L. 98-602 funds in cash and bonds does not mean that a proportionate share of each investment must be liquidated for the distribution to be Pub. L. 98-602 funds.

[61](AR2 0248.)

17

When KPMG concluded the Pub. L. 98-602 funds had a value of $212,170 when the

Shriner Tract was purchased, this amount was calculated by including interest and dividends that

were accruing.  As to this point, Hartman opined:

> Bond values certainly vary with fluctuations in interest rates, but
> that fluctuation is mooted when a bond is held to maturity.  There
> has not been any assertion of the intention to redeem the bonds
> prematurely . . . . The KPMG analysis appears to be a reasonable
> and accurate method of apportioning the account earnings between
> Pub. L. 98-602 funds and other funds.  There is no evidence in the
> documents analyzed by the Department that the Pub. L. 98-602
> funds "lost money."  Once accounts are merged, it is not necessary
> or desirable to identify the source of funds with each component of
> the investment portfolio.  KPMG used the actual earnings of the
> account value to determined the earnings to be apportioned . . . .
> That is an appropriate and accepted methodology.[62]

Hartman also noted that,

> [b]onds are listed regularly on financial statements at face value,
> not market value.  If a bond is held to maturity, the fluctuation of
> its market value is irrelevant.

and that,

> [t]he market value of the bonds is just a bookkeeping exercise.  A
> $100,000 bond paying 8.375% will be worth $100,000 at maturity
> and the annual income will be $8,375.  Characterizing the KPMG
> value as "fiction" is not accurate.  Both valuations are appropriate
> in context.  Banks value loans at <u>face value</u> regardless of interest
> rate fluctuations.

In issuing the final decision on reconsideration, the Secretary concluded that there was

nothing in the record or the legislative history of Pub. L. 98-602 to suggest that investment

income accruing from the original $100,000 could not be added to the principal $100,000 or that

the trust purchase would be defeated if the funds used for the purchase were derived from the

---

[62](AR2 0308(1).)

original award.  The Secretary considered that plaintiffs disputed "the accuracy and legitimacy of the KPMG letter" in which KPMG found "that the original $100,000 issued to the tribe as part of the 1984 statute amounted to $212,170 at the time the Wyandotte Tribe purchased the .52 acres known as the Shriner Tract."  The agency then proceeded to rely upon the determinations of Thomas Hartman, including his finding that there was sufficient money to purchase the Shriner Tract for $180,000, which took into account the interest and income derived from the original Pub. L. 98-602 funds.

**IV.     Discussion**

The Tenth Circuit ordered the remand of this matter to the Secretary "for further consideration of the question whether only Pub. L. 98-602 funds were used for the acquisition of the Shriner Tract."[63]  Plaintiffs contend that for a "multitude" of specific reasons, the Secretary's determination on remand that the Shriner Tract was purchased with only Pub. L. 98-602 funds was arbitrary and capricious and the determination was not supported by substantial evidence. The Court addresses these arguments in turn.

**A.     Interest and Earnings on the Original $100,000**

Plaintiffs challenge the Secretary's determination that  Pub. L. 98-602 permits the Tribe to use interest and investment income earned on the $100,000 to purchase the Shriner Tract.  The starting point in any case involving statutory construction is the language of the statute itself.[64]  Section 105 of Pub. L. 98-602 provides:

> (b) Twenty percent of funds allocated to the Wyandotte Tribe of
> Oklahoma pursuant to section 103(b) shall be used and distributed

---

[63]*See Sac & Fox v. Norton*, 240 F.3d at 1268.

[64]*Ramah Navaho Chapter v. Lujan*, 112 F.3d 1455, 1460 (10th Cir. 1997) (citation omitted).

in accordance with the following general plan:

(1) A sum of $100,000 of such funds shall be used for the purchase of real property which shall be held in trust by the Secretary for the benefit of the Tribe.

(2) The amount of funds in excess of $100,000 shall be held in trust by the Tribal Business Committee of such Tribe for the benefit of the Tribe.

(3) Any interest or investment income accruing on the funds described in paragraph (2) may be used by the Tribal Business Committee of such Tribe for any of the following purposes.

    (A) Education of the members of such Tribe . . .

    . . .

    (D) Land purchases for the use and benefit of such Tribe.

    . . .

(c)(1) Except as provided in paragraph (2) and notwithstanding any other provision of law, the approval of the Secretary for any payment or distribution by the Wyandotte Tribe of Oklahoma of any funds described in subsection (b) . . . shall not be required and the Secretary shall have no further trust responsibility for the investment, supervision, administration, or expenditure of such funds.

    (2) The Secretary may take such action as the Secretary may determine to be necessary and appropriate to enforce the requirements of this title.

Plaintiffs argue that the statute is clear and unambiguous about the Pub. L. 98-602 funds: $100,000 and $100,000 alone could be spent on the land acquired pursuant to Section 105(b)(1). Thus, plaintiffs contend, any real estate purchased with Pub. L. 98-602 funds had to have a purchase price of $100,000 or less, or the mandatory nature of the transaction would be

defeated.[65]

The Court disagrees.  Section 105(b) sheds little light on the question of whether the Tribe is limited to purchasing the Shriner Tract with only the original $100,000, or if they may use additional interest or investment income accrued from the $100,000.  In one section of the statute, Congress clearly contemplates that the Tribe will invest settlement funds, going so far as to divest the Secretary of trust responsibility for the investment, supervision, administration, or expenditure of those funds.[66]  In another section, Congress informs us that "a sum of $100,000 . . . shall be used for the purchase of real property which shall be held in trust for the benefit of [the Tribe]."[67]  The statute does not clearly limit the Tribe to the purchase of a parcel with a price of $100,000 or less, nor does it clearly prohibit use of money resulting from the investment of that amount being applied to the purchase price of any property.

When faced with an ambiguous federal statute, the court typically defers to the administering agency's interpretation as long as it is based on permissible construction of the statute at issue, under the principles announced in *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*[68]  *Chevron* requires a two-step analysis.  The first question "always, is . . . whether Congress has directly spoken to the precise question at issue."[69]  "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give

_____

[65]*See Sac & Fox v. Norton*, 240 F.3d at 1262 (Pub. L. 602 affords the Secretary no discretion in deciding to take land purchased by the Wyandotte Tribe with Pub. L. 602 funds into trust).

[66]Pub. L. 98-602, section 105(c)(1).

[67]Pub. L. 98-602, section 105(b)(1).

[68]467 U.S. 837, 842-43 (1984).

[69]*Id*. at 842.

effect to the unambiguously expressed intent of Congress."[70]  But if the statute is silent or

ambiguous, the Court is generally required to defer to the agency's interpretation "if it is based

on a permissible construction of the statute."[71]  More specifically, if the Court finds "an express

delegation of authority to the agency to elucidate a specific provision of the statute by

regulation," we must accept the agency's interpretation unless it is "arbitrary, capricious, or

manifestly contrary to the statute."[72]  Alternatively, if the Court does not find an express

delegation by Congress, but nevertheless perceives an implicit delegation to the agency on the

particular question, it must accept a "reasonable interpretation made by the administrator of [the]

agency."[73]

       The Court notes that the Tenth Circuit has held that the canon of construction that

ambiguities are to be resolved in favor of Native Americans may control over the deference

otherwise afforded administrative agencies under *Chevron*.[74]  In *Ramah Navaho Chapter v.

Lujan*,[75] the court, construing regulations promulgated by the Secretary of the Interior to

implement the Indian Self Determination and Education Assistance Act that were opposed by the

tribes, stated that "for purposes of this case, the canon of construction favoring Native

Americans controls over the more general rule of deference to agency interpretations of

---

[70]*Id.* at 842-43.

[71]*Sac & Fox v. Norton*, 240 F.3d at 1260-61 (quoting *Chevron*, 467 U.S. at 843).

[72]*Id.* at 1261 (quoting *Chevron*, 467 U.S. at 843-44).

[73]*Id.* (quoting *Chevron*, 467 U.S. at 844).

[74]*See Ramah Navajo Chapter v. Lujan*, 112 F.3d 1455, 1461-62 (10th Cir. 1997) (citing *Montana v. Blackfeet Tribe*, 471 U.S. 759, 766 (1985)).

[75]*Id.*

ambiguous statutes."[76]  The Tenth Circuit has also held, however, that this canon is inapplicable

when "the [competing] interests at stake both involve Native Americans."[77]  Accordingly, this

canon of construction unique to Indian matters is inapplicable here, because the instant case

involves judicial review of Federal laws affecting competing Native American interests.[78]

Where, as here, Congress has not "directly spoken to the precise question at issue," the

second *Chevron* test requires the Court to uphold the agency's interpretation "if it is based on a

permissible construction of the statute."[79]  To resolve this question, the Court must first

determine the Secretary's position.

The Secretary rejected plaintiffs' strict interpretation of the statute, which places the

Tribe in the position of seeking to buy real estate with a purchase price of exactly $100,000, and

which defendants characterize as an "absurd" result.  The Secretary also rejected plaintiffs'

invocation of the maxim *expressio unius exlusio alterius*, or "the expression of one is the

exclusion of the other."  Plaintiffs argue that since Section 105(b)(3) specifies that interest and

investment income from the money provided to the Tribal Business Committee in Section

105(b)(2) can be used for the purposes enumerated in that section, Congress could not have

intended that any interest or investment income be used from the $100,000 provided in

---

[76]*Id.* (stating that the outcome hinged on the purpose of the act being interpreted ).  Subsequently, in *United States v. 162 MegaMania Gambling Devices*, 231 F.3d 713, 718 (10th Cir. 2000), the Circuit cited the Indian canon with approval, but proceeded to resolve the question in favor of the tribes based in part upon *Chevron* deference.

[77]*Utah v. Babbitt*, 53 F.3d 1145, 1150 (10th Cir. 1995) (citing *Northern Cheyenne Tribe v. Hollowbreast*, 425 U.S. 649, 655 n.7 (1976) ("[This] canon has no application here; the contesting parties are an Indian tribe and a class of individuals consisting primarily of tribal members.")).

[78]In any event, as discussed *infra*, the Secretary's interpretation of Section 105(b) ultimately favors the Tribe.

[79]*Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984).

paragraph 1 or they would have stated such in the statute.  Instead, the Secretary adhered to the Supreme Court's long standing guidance that rules and maxims, such as the one upon which plaintiffs rely, are "subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose, will read text in the light of context, and will interpret the text so far as the meaning of the words fairly permits so as to carry out in particular cases the generally expressed intent."[80]  Applying that guidance to Pub. L. 98-602, the Secretary concluded that because the purpose of Pub. L. 98-602 was to provide benefits to the Tribe by paying settlements awarded by the I.C.C., there was nothing indicating Congress intended to preclude the addition of investment income to the original $100,000, either in the legislative history or the record of the case.  The Secretary determined there was no language in the statute triggering the defeat of the trust purchase if more than the $100,000 is used to purchase the real estate, when the additional funds were derived from the original Pub. L. 98-602 award.  The Secretary also concluded that if an ambiguity does exist in the language of Section 105(b)(1), resolution of the ambiguity should benefit the Tribe, unless it would be against the "clear expressions of . . . Congressional intent."[81]

The Court concludes that the Secretary's interpretation of Section 105(b) is entitled to deference and should be affirmed under *Chevron*.  The Department of Interior has exclusive responsibility regarding taking land into trust for an Indian tribe pursuant to Pub. L. 98-602, and as such, it must determine the intent of the statute.  In her Opinion on Reconsideration, the Secretary concluded that it is clear that the objective of Congress in implementing Pub. L. 98-

---

[80]*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 350-51 (1943).

[81]*NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002) (en banc).

602 was to benefit the Tribe by funding the purchase of land to be taken into trust by the Secretary.  In implementing Pub. L. 98-602, Congress established a plan for allocating the funds the Tribe was to receive, including the mandate to take the land into trust, which is typically a role delegated to the Secretary of the Interior.  In so doing, Congress removed the Secretary's discretion to take the land into trust.[82]  Clearly, the objective of Congress in implementing Pub. L. 98-602 was to fund the purchase of land for the Tribe.  It is apparent that Congress intended for the Tribe to purchase real estate with little or no interference from the Secretary.

In rejecting the legal maxim relied on by plaintiffs, the Secretary correctly adhered to the Supreme Court's guidance that details of an act are to be construed in conformity with "its dominating general purpose," concluding there was nothing indicating Congress intended to preclude the addition of investment income to the original $100,000.  "Because the canon's purpose is to resolve a question not answered by the statute, the canon is not particularly useful where legislative history clearly evinces congressional intent, especially in this context of construing statutes governing Native American affairs."[83]

Finally, the Secretary concluded that broad construction of statutes involving Indian rights required a resolution of any ambiguity in Section 105(b) in favor of the Tribe, as there is no evidence that to do so would be against the clear expressions of congressional intent.  Having considered congressional intent and its deferential role as a reviewing court, the Court finds that the Secretary's interpretation of Section 105(b) is based on a reasonable construction of the

_____

[82]*See* 25 U.S.C. § 465 and implementing regulations at 25 C.F.R. § 151.

[83]*Seneca-Cayuga Tribe of Okla. v. NIGC*, 327 F.3d 1019, 1035 (10th Cir. 2003) (citing *NLRB v. Pueblo of San Juan*, 276 F.3d at 1196 ("While [expressio unius] may find application in other types of cases, in matters of Indian law expressio unis must often be set aside.")) (internal citations and quotations omitted).

statute, and is not arbitrary, an abuse of discretion or in excess of its jurisdiction.

**B.      $5000 Earnest Money Deposit**

Pub. L. 98-602 provides that the funds shall be used for the "purchase" of real property. Plaintiffs argue that to the extent the Shiner Tract was purchased with other than Pub. L. 98-602 funds, the conclusion must be drawn that the Shriner Tract was not purchased only with Pub. L. 98-602 funds.  Plaintiffs argue that the evidence presented on the second remand demonstrates that $5000.00 of the purchase price for the Shriner Tract was paid for by NORAM from funds that were not Pub. L. 98-602 funds.  Plaintiffs contend that defendants' reliance on the fact that the Tribe presented a cashier's check in the amount of $180,000.00 at closing ignores evidence that the $5000.00 from NORAM had already been paid and credited towards the purchase of the property.  Although the Tribe made an overpayment at closing for which it received a refund, NORAM never received a refund, leading plaintiffs to conclude that the $5000.00 was applied towards the purchase price.  Moreover, plaintiffs contend that the purchase price for the Shriner Tract was defined in paragraph 4 of both real estate contracts, which specifically defined the purchase price not only to include the $175,000.00 remaining due after application of the $5000.00 paid by NORAM, but also any and all other funds due at closing for "prorations, closing costs and other agreed expenses."  These agreed expenses included the $19,500.00 real estate commission, among other items, which plaintiffs argue cannot be divorced from the purchase price.  Plaintiffs urge that the Secretary's acceptance of the Tribe's assertion that the $5000.00 was not applied to the purchase price of the Shriner Tract is not supported by substantial evidence and is in fact, contradicted by the record.

The Court disagrees.  Although the Court's inquiry into the record is careful and

searching, it may not substitute its own judgment for that of the agency.[84]  Thus, even though the

Court may not agree with the agency's ultimate findings, it will not set them aside if they are

supported by substantial evidence.  The Court has thoroughly reviewed the administrative record

before it, as supplemented on remand, and concludes that the Secretary's findings of fact are

supported by substantial evidence.  Specifically, the contract sale price for the Shriner Tract was

$180,000.00, the same amount withdrawn by the Tribe from its Mercantile Account and brought

to closing on July 16, 1996.  The evidence supports the Tribe's position that the $5000.00

earnest money from NORAM was not applied to the purchase price, but rather, was refunded.

The closing statement reflects and accounts for the $5000.00 deposit, and reflects that without

any credits, the Tribe needed $199,823.50 to close the transaction.  That amount included the

contract sale price, the commission and all anticipated closing expenses.  The Tribe brought the

full $199,823.50 to closing, supporting its position that it came to the closing without any

apparent intent to be given credit for the earnest money deposit.  The disbursement statement

reflects that there was a resulting overpayment of $9,668.90 at closing, more than enough to

repay the $5000.00 earnest money deposit.  Whether or not the Tribe repaid the $5000.00 to

NORAM is not relevant to the limited issue before the Court.  The total amount spent by the

Tribe at closing was less than the Tribe had available in Pub. L. 98-602 funds.  Given these facts,

it was not arbitrary, capricious or contrary to law for the agency to find that the Tribe used only

Pub. L. 98-602 funds to purchase the Shriner Tract.

### C.    Purchase of Shriner Tract with Pub. L. 98-602 Funds

Plaintiffs assert that "there is no evidence in the record reflecting what happened to the

---

[84]*Hoyl v. Babbit*, 129 F.3d 1377, 1383 (10th Cir. 1997).

$180,000 proceeds from the margin account loan made in July 1996, from the Wyandotte's investment account." This issue appears to have been resolved by this Court's remand for additional investigation or explanation of the $5,000 escrow check, discussed *supra*. The administrative record reflects that on July 12, 1996, $180,000 was disbursed from the Mercantile Account held for the Tribe;[85] the disbursement statement issued at the July 16, 1996 closing reflects that the Tribe brought $180,000 for the purchase price and $19,823.50 for other costs and expenses to closing.[86] The closing statement indicates the purchase price was to be made by cashier's check made payable to Guarantee Title of Wyandotte County.[87] Given this record, it was not arbitrary, capricious or contrary to law for the Secretary to find that the Tribe used only Pub. L. 98-602 funds to purchase the Shriner Tract and substantial evidence supports the conclusion.

Moreover, the Court notes that plaintiffs' inference that the Shriner Tract was not purchased with Pub. L. 98-602 funds because there is no paper trail from the Mercantile Account to the cashier's check presented at closing was not clarified before the agency at the administrative stage and appears to be inconsistent with the crux of the objections in the instant appeal. Throughout both proceedings, plaintiffs have based their objections on the fact that the Shriner Tract was purchased with a margin loan against the investment account holding the bonds purchased with the original Pub. L. 98-602 funds; there was no dispute that the source of the $180,000 payment at closing was the Mercantile Account. The Court will not set aside the

---

[85](AR1 0265-0266, 0273, 0276.)

[86](Doc. 65-11, at 4, lines I. B. and C.)

[87](Doc. 65-9, at 8.)

28

Secretary's decision on these grounds.

### D.   Margin Account Loan

There appears to be no dispute that $95,000 of the original $100,000 in Pub. L. 98-602 funds were invested in bonds that were part of a Mercantile investment account.  These funds were commingled with other investments into a general Tribe investment account, from which $180,000 was borrowed through margin loans in July 1996, and was purportedly used to purchase the Shriner Tract.  Plaintiffs continue to argue that this evidence establishes that no Pub. L. 98-602 funds were used to purchase the Shriner Tract.  They argue that the record instead reflects that the market value in July 1996, of corporate bonds purchased with Pub. L. 98-602 funds ten years earlier, served in part, as collateral for a margin loan in the total amount of $180,000, and that these bonds were not liquidated to produce funds with which the Shriner Tract was purchased.  Because the source of the $180,000 was a loan, and not the actual Pub. L. 98-602 funds, plaintiffs posit that the Shriner Tract was not purchased with Pub. L. 98-602 funds.      Upon receipt of the parties' briefs at the administrative level, counsel for the Department of Interior requested an analysis of the financial issues from Thomas Hartman, the Financial Analyst on the Indian Gaming Management Staff.  Hartman was specifically requested to review the arguments raised by plaintiffs, including "[t]he '10 reasons' why the KPMG report 'is seriously flawed' and unreliable . . . ."[88]  Reason number 10 listed in plaintiffs' brief was that the $180,000 came from a loan on a margin account.[89]

After reviewing the respective claims of  plaintiffs and the Tribe, Hartman concluded that

---

[88](AR2 0257.)

[89](AR2 0151-0152.)

KPMG used "appropriate and accepted methodology," the Pub. L. 98-602 funds were invested in bonds and commingled with other investments, the Pub. L. 98-602 investment did not lose money, and there was adequate money to purchase the Shriner Tract for $180,000.  Hartman noted there was no evidence in the record to suggest that the bonds would be redeemed prematurely or that any loan against the Pub. L. 98-602 funds would not be repaid at full face value.[90]  In specific response to plaintiffs' reason number 10, Hartman stated,

> [i]n a commingled account, using the cash portion would be quite reasonable, particularly if the bonds had a higher yield than the cash.  The proportionate share of PL 680 funds in cash and bonds does not mean that a proportionate share of each investment must be liquidated for the distribution to be PL 602 funds.[91]

In other words, Hartman concluded it was reasonable and acceptable for the Tribe to pay for the Shriner Tract with a margin account loan secured by the bonds that remained in the investment account.  It is apparent that the Secretary based its conclusions on remand on the reasoned opinions of Hartman and KPMG.  Because defendants' conclusion that a margin account loan was permissible was a "reasonable decision" based on "relevant factors,"[92] the Court does not find that they acted arbitrarily or capriciously.

---

[90](AR2 0308-0309.)

[91](AR2 0325.)

[92]*Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

E.        **Value of Pub. L. 98-602 Funds**

In a related vein, plaintiffs argue that the relevant issue before the agency on remand was the proper approach to valuing the Pub. L. 98-602 bonds at the time of the margin account loan: if the value of the Pub. L. 98-602 bonds was inadequate to allow for a $180,000 margin account loan without resort to other collateral, the determination that only Pub. L. 98-602 funds were used must be rejected.  Plaintiffs assert that the market value, not the face value, was the correct methodology for valuing the Pub. L. 98-602 funds.  Plaintiffs' financial analyst, Purinton, Chance and Mills, concluded that the market value of the Pub. L. 98-602 funds in July 1996 was only $112,000.[93]  In contrast, KPMG concluded that the Pub. L. 98-602 funds had a value of $212,170 when the Shriner Tract was purchased.[94]

As with the forgoing issue, defendants looked to Thomas Hartman for guidance and review of the competing approaches to valuation submitted by plaintiffs and the Tribe.  Hartman opined as follows:

> Bond values certainly vary with fluctuations in interest rates, but that fluctuation is mooted when a bond is held to maturity.  There has not been any assertion of the intention to redeem the bonds prematurely . . .  The KPMG analysis appears to be a reasonable and accurate method of apportioning the account earnings between Pub. L. 98-602 funds and other funds.  There is no evidence in the documents analyzed by the Department that the Pub. L. 98-602 funds "lost money."  Once accounts are merged, it is not necessary or desirable to identify the source of funds with each component of the investment portfolio.  KPMG used the actual earnings of the account value to determined the earnings to be apportioned . . . That is an appropriate and accepted methodology.[95]

---

[93](AR2 0155.)

[94](AR1 0265-0266.)

[95](AR2 0308(1)).

Hartman also noted that,

> [b]onds are listed regularly on financial statements at face value,
> not market value.  If a bond is held to maturity, the fluctuation of
> its market value is irrelevant.

and that,

> [t]he market value of the bonds is just a bookkeeping exercise.  A
> $100,000 bond paying 8.375% will be worth $100,000 at maturity
> and the annual income will be $8,375.  Characterizing the KPMG
> value as "fiction" is not accurate.  Both valuations are appropriate
> in context.  Banks value loans at <u>face value</u> regardless of interest
> rate fluctuations.

In reaching the final decision on reconsideration, the Secretary considered that plaintiffs

disputed "the accuracy and legitimacy of the KPMG letter" that concluded that the original

$100,000 of Pub. L. 98-602 funds amounted to $212,170 at the time the Tribe purchased the

Shriner Tract.[96]  The Secretary considered plaintiffs' arguments and exhibits, including their

accounting report and analysis.  Defendants also considered the expertise and findings of KPMG

and Thomas Hartman, which took into account the interest and income derived from the original

Pub. L. 98-602 funds in concluding that there was sufficient money to purchase the Shriner Tract

for $180,000.[97]  Ultimately, the Secretary decided to rely on Hartman's determinations rather

than that of plaintiffs' analysts.

Once again, it is apparent that defendants based their conclusions on the reasoned

opinions of Hartman and KPMG.  "[A]gencies are entitled to rely on their own experts so long as

their decisions are not arbitrary and capricious."[98]  The Court appreciates that plaintiffs patently

---

[96](AR2 0322-0323.)

[97]*Id.*

[98]*Wyoming Farm Bureau Fed. v. Babbitt*, 199 F.3d 1224, 1241 (10th Cir. 2000) (quotation omitted).

disagree with the Secretary's conclusions concerning the margin loan and the value of the Pub. L. 98-602 funds.  The Court also recognizes that plaintiffs cite evidence in the administrative record that they believe supports their position.  The mere presence of contradictory evidence, however, does not invalidate defendants' actions or decisions.[99]  Plaintiffs fail to show a lack of substantial evidence in the administrative record to support the Secretary's conclusions, or that the expert accounting opinions of Hartman and KPMG were otherwise inadequate to foster informed decision-making.  Finally, the Secretary's decision is not so "implausible that it could not be ascribed to a difference in view or the product of agency expertise."[100]  The fact that plaintiffs harbor a difference in accounting analysis is insufficient to find the agency decision to be arbitrary and capricious, and the Court will not overturn the agency's decision on this basis.

### F.       Actual Purchase Price of Shriner Tract

The administrative record reflects that the original contract purchase price in July 1995 for the Shriner Tract was $325,000.  In February 1996, the Shriner Tract was appraised for $182,000, and in June 1996, a second contract for purchase was entered into for a purchase price of $180,000.  Plaintiffs contend that the $180,000 purchase price is a "fiction," and that the actual price was $325,000.  Plaintiffs argue that the June 1996 contract continued to obligate Nations Realty to pay the real estate broker a commission of $19,500, which is the same commission amount in the first contract and reflects 6 % of the purchase price of $325,000.  As the Secretary points out, this is a new argument that was never made to the agency and is thus

---

[99]*Id.* (citing *Trimmer v. United States Dep't. of Labor*, 174 F.3d 1098, 1102 (10th Cir. 1999).

[100]*O'Keeffe's, Inc. v. United States Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (10th Cir. 1996).

inappropriate for consideration upon review.[101]

Plaintiffs make much of the fact that the purchase price was reduced to $180,000 in conjunction with the noncompete agreement limiting the seller, McCurry Enterprises, from engaging in any entertainment enterprise, including gaming, within one mile of the Shriner Tract in exchange for $152,250, going so far as to characterize the nature of the agreement as a sham. Instead, plaintiffs argue, the purchase price was bifurcated into two contracts, allowing the Tribe to manipulate the purchase price of the Shriner Tract in order to invoke the mandatory provisions of Pub. L. 98-602.  Plaintiffs do not go so far as to allege, nor does the administrative record reflect, that the noncompete agreement was assigned to the Tribe or that the Tribe was otherwise involved in that agreement.

Plaintiffs' sham argument was considered and rejected by the Secretary as speculation. Instead, the agency concluded the purchase price was $180,000, relying on the 1996 appraisal, the 1996 sales contract and the Tribe's representations.  Again, it is not the function of this Court to weigh the evidence.[102]  Rather, the Court's role is confined to ascertaining whether the agency's decision was supported by substantial evidence.[103]  The administrative record adequately supports the Secretary's determination that the Shriner Tract purchase price was $180,000.  The fact that the administrative record contains some evidence pointing to a different conclusion does not render the agency's decision arbitrary and capricious.[104]

---

[101](AR2 0217, 0279); *Fed. Power Comm'n v. Colo. Interstate Gas Co.*, 348 U.S. 492 (1955).

[102]*Colorado Wild, Heartwood v. U.S. Forest Service*, 435 F.3d 1204, 1221 (10th Cir. 2006) (citing *Pennaco Energy, Inc. v. United States Dep't of Interior*,  377 F.3d 1147, 1159 (10th cir. 2004)).

[103]*Id.* at 1221-22 (citing *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994)).

[104]*Id.* at 1222 (citing *Pennaco Energy*, 377 F.3d at 1159).

34

**V.**      **Conclusion**

The Court rejects plaintiffs' claims that the Secretary's interpretation of Pub. L. 98-602 and the resulting substantive findings that only Pub. L. 98-602 funds were used to purchase the Shriner Tract were arbitrary and capricious.  Accordingly, the Court affirms the Secretary's decision and denies plaintiffs' remaining claims for relief.

**IT IS SO ORDERED.**

Dated this  9th  day of May 2006.

                                          S/ Julie A. Robinson
                                         Julie A. Robinson
                                         United States District Judge